IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| J.M.S., | : | |
|       Plaintiff, | : | |
| | : | |
| v. | : | Case No. 5:21-cv-00323-CHW |
| | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | Social Security Appeal |
| | : | |
|       Defendant. | : | |
| | : | |

## REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff J.M.S.'s application for disability benefits. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. Because substantial evidence supports the Commissioner's decision, the decision in Plaintiff's case is **AFFIRMED**.

## BACKGROUND

Plaintiff applied for Title II disability benefits on January 9, 2019, alleging disability beginning on January 1, 2014, based on prinzmetal angina, migraine headache, period limb movement disorder, bipolar depression, anxiety, carpal tunnel syndrome, tendonitis of the thumbs, herniated discs at C6 and C7 with pinched nerve, GERD, and insomnia. (R. 327-328, 340-341, 354-355). Her date last insured (DLI) was March 31, 2019. (R. 327, 340, 354). After Plaintiff's application was denied initially and on reconsideration at the state agency level of review (Exs. 1A, 2A, 4A). Plaintiff requested further review before an administrative law judge (ALJ). The reviewing ALJ held a telephone hearing on February 11, 2021 (R. 41-71) and issued

1

an unfavorable opinion on March 31, 2021. (R. 13-33). Plaintiff's request for review of that decision by the Appeals Council was denied on July 8, 2021. (R. 1-7). The case is now ripe for judicial review. *See* 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Because Plaintiff was last insured on March 31, 2019, disability must be established prior to that date. *See id.*

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified

impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v).

## MEDICAL RECORD

The record includes records of treatment for Plaintiff's migraine headaches, in addition to GERD and gastritis (Exs. 1F, 2F, 5F, 7F, 8F, 10F, 14F), chest pain (Exs. 9F, 18F), fibromyalgia (Exs. 18F, 24F), sleep apnea, (Exs. 2F, 16F, 18F), carpal tunnel syndrome (Exs. 2F, 18F), degenerative disc and joint diseases and related surgeries (Exs. 2F, 6F, 11F, 12F, 21F, 24F, 25F), gynecological issues (R. 747, Ex. 8F), and mental health issues, such as depression and anxiety (Exs. 2F, 3F, 6F, 23F). The error raised by Plaintiff, however, involves the appropriateness of the ALJ's consideration of Plaintiff's migraines and any related limitations on her ability to work as permitted by the RFC. While the entire medical record has been reviewed, the summary of medical record will focus on Plaintiff's treatment and description of symptoms for her migraines and other headaches.

Plaintiff treated with Dr. Iyad Al Husein as her primary care provider. In January 2014, Plaintiff reported having a frontal headache for a few days, which Dr. Al Husein contributed to sinus issues. (R. 684-685). At an October 2014 visit, Plaintiff again complained of a similar frontal headache, which she believed may be related to medication. (R. 660). She experienced no visual disturbances with these headaches. (*Id*., R. 684).

When Plaintiff visited Dr. Al Husein in June 2015, she complained of migraines and heartburn, which she contributed to taking a lot of headache powders. (R. 640). Dr. Al Husein

suggested that Plaintiff stop taking the powders and use Tylenol as needed. (R. 641). He discussed the future need for injections to control Plaintiff's headaches. (*Id.*) Notes indicate a history of seeking emergency treatment for headache treatment, but Plaintiff did not disclose any recent emergency room visits. (*Id.*) Although Dr. Al Husein attributed many of Plaintiff's symptoms to sleep apnea. (*Id.*), a July 2015 sleep test was negative. *See* (R. 736).

At her October 2015 appointment, Plaintiff reported the same-day onset of a migraine with light and sound sensitivity and nausea. (R. 736). She reported having extreme migraine attacks one to two times a year and described a "throbbing occipital headache." (*Id.*) Dr. Al Husein gave Plaintiff an injection for her migraine and Phenergan to take as needed, with instructions to contact the office if she experienced no relief within 24 hours. (R. 737). In November 2015, Plaintiff reported having a migraine every week or two, but the shot received in October resolved her migraine within two hours. (R. 734). Plaintiff explained that she rarely needed emergency treatment for her migraines. (*Id*).

In August 2016, Plaintiff reported she was responding well to treatment with Trokendi and had experienced only one mild migraine attack. (R. 1393). Plaintiff again reported only one migraine attack and stated her regular headache was resolved at her September 2016 appointment. (R. 1391). In October 2016, Plaintiff reported more frequent headaches, which she attributed to stress and allergies. (R. 1388). The notes do not describe these headaches as migraines. (*Id.*) Trokendi was controlling Plaintiff's headaches well in November 2016. (R. 1380).

Plaintiff stated that her "migraine is doing great" at her January 2017 appointment. (R.1375). In February 2017, Plaintiff again experienced more frequent headaches, which she attributed to stress and allergies. (R. 1372). At her April 2017 appointment, Plaintiff reported one

migraine during the previous month, but she was compliant on her medications and stated that her headache was okay. (R. 1367). Plaintiff had experienced three migraine attacks by her August 2017 appointment, and Dr. Al Husein increased the dosage of Trokendi. (R. 1356). At the next appointment in September 2017, she reported increased sleepiness, but she had not experienced any migraines on the increased dosage. (R. 1354). Treatment notes from November 2017 describe Plaintiff's migraine as stable. (R. 1351). In December 2017, Plaintiff did not complain of headache. (R. 1348).

Plaintiff described having slightly more headaches at her March 2018 appointment, but notes do not show she complained of a headache at the appointment. (R. 1337). Plaintiff reported a headache and other symptoms in September 2018, but Dr. Al Husein related the symptoms to Effexor withdrawal. (R. 1321, 1322). No current migraine was noted. (*Id.*) In December 2018, Plaintiff reported frequent headaches, but since being back on Trokendi, the headaches were somewhat better. (R. 1311, 1316).

Plaintiff did not complain of headaches or migraines at the January and February 2019 appointments. (R. 1308, 1311). In February 2019, Plaintiff appeared to be "well rested." (R. 1308). In March 2019, Plaintiff stated she experienced some morning headaches and restless, sleepless nights, but she did not have a headache at the appointment. (R. 1305). In May 2019, Plaintiff complained of near daily migraine attacks that she was unable to control. (R. 1299). She reported taking headache powders every day. (*Id.*)  Dr. Al Husein asked Plaintiff to keep a headache log (R. 1301), and he increased Plaintiff's dosage of Trokendi. (R. 1300). In June 2019, Plaintiff reported that a change in medication somewhat improved her migraines and that she was having at least one migraine attack weekly. (R. 1294). At the time of the appointment, Plaintiff did not have a headache. (*Id.*)

At an August 2019 visit to Dr. Al Husein, Plaintiff was experiencing a migraine attack that had lasted three to four days, accompanied by intermittent facial tingling. (R. 1282). Plaintiff received an injection for the headache and was scheduled for routine follow-up unless she needed an earlier appointment. (R. 1284). Plaintiff had a head MRI without contrast on August 8, 2019. (R. 1237-1238, 1664). The results raised a concern for multiple sclerosis and chronic small ischemic changes. (R. 1238). However, Plaintiff's headaches were noted to be improved in September 2019. (R. 1276). In November 2019, Plaintiff discussed her treatment for fibromyalgia with Dr. Al Husein, but she denied having headaches. (R. 1270).

The record includes urgent care and emergency room (ER) treatment for Plaintiff's headaches. Plaintiff visited urgent care after being stung by a yellow jacket in August 2017. (R. 1198). She also reported having a headache and a history of migraines. (*Id.*) In September 2018, Plaintiff visited an urgent care with a headache that had lasted two days despite taking her migraine medication. (R. 1172, 1174). Plaintiff also experienced blurred vision, nausea, and light and sound sensitivity. (R. 1174).

Plaintiff sought care at the ER in August 2019 with complaints of a migraine that had lasted one week despite taking migraine medications. (R. 1219). She also had nausea and facial numbing. (*Id.*) She denied that this was the worst headache that she has ever had. (R. 1224). A CT performed without contrast showed no acute issue but noted possible early microvascular ischemic changes. (R. 1226). With medication and IV hydration, the headache improved, and Plaintiff declined to have a CT with contrast and spinal tap. (R. 1224). She left the ER against medical advice. (*Id.*)

The record shows that Plaintiff's report of headaches varied when visiting her other treatment providers. For example, in June 2015, Plaintiff reported headaches to Dr. Saymeh

when she visited him for reflux. (R. 725). Like Dr. Al Husein, Dr. Saymeh told Plaintiff to take Tylenol for her headaches. (R. 726). Plaintiff reported having a headache during pre-operative exams for a 2016 colonoscopy (R. 941) and 2019 endoscopy. (R. 938). She also had headaches on the day of the procedures. (R. 978, 1063). In January 2016, Plaintiff reported a history of migraine headaches while treating at OrthoGeorgia, but the records are unclear whether Plaintiff had a headache at this visit. *See* (R. 1122). At an OrthoGeorgia appointment in May 2016, Plaintiff reported frequent headaches. (R. 1425). In April 2019, at an appointment to check for celiac disease, Plaintiff complained of a headache. (R. 1143).

During other treatment, no complaints of migraines or other headaches were documented. Records from Plaintiff's gynecologist from 2013 to 2016 show that Plaintiff experienced headaches with prior hormonal therapies (R. 795), but at no appointment did she state she was experiencing headaches. *See generally* (Ex. 8F, R. 1102). In October 2016, Plaintiff presented to the emergency room for complications following a hysterectomy. (R. 1074). No complaints of headaches were documented. (R. 1076). When Plaintiff returned for her December 2016 colonoscopy results, she reported no headaches. (R. 939). During a 2018 hospital admission for chest pain, no history or complaints of headaches were noted. *See generally* (Ex. 9F). At a March 2019 appointment at Surgical Associates of Warner Robins, Plaintiff did not report headaches. (R. 1146).

The medical record before the ALJ also demonstrated that Plaintiff sought out of state treatment for her migraines after her DLI. Plaintiff visited treatment providers in Texas in July and August 2020. (Ex. 20F). In late July 2020, Plaintiff presented to the ER at Texas Presbyterian Hospital when her headache worsened after arriving in Texas but before she could see the specialist at Baylor. (R. 1416). Plaintiff described her headaches as intermittent for the

past month. (*Id.*) Plaintiff again sought emergency treatment a few days later. (R. 1408). Notes from this visit describe Plaintiff's headache as a "waxing and waning migraine" starting two months ago despite taking her medications. (*Id.*)

Plaintiff visited treatment providers in Michigan for her migraines in August and September 2020. (Exs. 22F, 23F). Plaintiff's history indicates that she had intermittent headaches until age 40, when the headaches increased in frequency and severity. (R. 1469). By January 2020, Plaintiff stated that she had daily, severe headaches. (*Id.*) The headaches were also accompanied by numbness, tingling, and occasional visual disturbances. (*Id.*) Records indicated that Plaintiff sought emergency treatment four times and had three hospitalizations in 2020. (R. 1470). She was admitted to the headache unit and underwent a diagnostic lumbar puncture and cervical block. (R. 1476, 1479, 1485, 1552-1554, 1561-1563). Plaintiff received several diagnoses, including chronic, intractable migraine without aura, cervicogenic headache, medication overuse headache, and idiopathic intracranial hypertension. (R. 1461, 1476).

Prior to entry into the headache unit, Dr. Pingel saw Plaintiff for an initial psychological consultation. (R. 1613). At this appointment, she reported near moderate to severe, constant pain. (*Id.*) Plaintiff explained that she slept poorly and that her daily activities were limited. (*Id.*) Plaintiff stated that in early 2019 she began experiencing daily headaches. (R. 1614). She reported emergency room and urgent care treatment at least 10 times in 2020, at which she received additional migraine medications. (R. 1614). At a follow-up session with Dr. Pingel, Plaintiff reported improvement in her pain and her overall mood. (R. 1589). She also reported that she slept better and that even her husband had noticed she felt better. (*Id.*)

In addition to the out-of-state treatment, Plaintiff treated with Dr. Parihar at Premier Neurology beginning in September 2019 and Dr. Stefanis in October 2020. (Exs. 24F, 25F). At

the first appointment with Dr. Parihar, Plaintiff explained that she had three to four headaches per week and that the frequency increased over the last year. (R. 1639). Plaintiff reported increased emergency room treatment was needed to control her migraines. *See* (R. 1621, 1624, 1627). Plaintiff's history notes from Dr. Parihar in November 2020 reflect that Plaintiff's headaches increased over the previous six to seven months. (R. 1618). The October and November 2020 treatment notes from Dr. Stefanis reference Plaintiff's headache history and describe her headaches as constant, but no headaches were noted in Plaintiff's review of symptoms. (R. 1648, 1650, 1656-1657, 1660-1661, 1664-1665). Dr. Stefanis performed an anterior cervical discectomy and fusion at C4-C5 in November 2020. (R. 1652, 1667-1671).

Plaintiff also provided additional records to the Appeals Council concerning mostly emergency room treatment and hospital admissions at Houston Medical Center from November 24, 2019 until April 8, 2021. (R. 67-326). Several of these visits concerned Plaintiff's migraines. *See, e.g.*, (R. 69, 103, 113, 131, 142, 179, 281, 295).

*Consultative Examinations*

As part of her application, Plaintiff submitted to two consultative examinations. On September 30, 2015, Dr. Robert Foster saw Plaintiff for a psychological consultative exam. (Ex. 3F). His evaluation consisted of interviewing and observing Plaintiff and reviewing her function report and medical notes. (R. 704). At the conclusion of the evaluation, Dr. Foster diagnosed Plaintiff with moderate-severe major depressive disorder-recurrent without psychosis and pain disorder. (R. 707). He noted Plaintiff's medical problems, including migraines, but Plaintiff did not attribute migraines to having to leave her job or her inability to work when discussing her work history. *See* (R. 704-707). Dr. Foster described Plaintiff as teary with notable anxiety and stammered speech, however, he found her ability to participate and relay information to be

unaffected. (*Id*.) Plaintiff had some issues with memory and concentration. (R. 706-707). Dr. Foster suggested that Plaintiff's ability to interact with others and follow simple directives would be moderately impacted by her conditions. (R. 707).

Plaintiff visited Dr. Stanford Williamson for a physical consultative exam on October 2, 2015. (Ex. 4F). Dr. Williamson noted Plaintiff's allegation of issues with her hands. (R. 717). After a physical examination, Dr. Williamson found that Plaintiff may have difficultly with prolonged reaching, pushing, pulling, grasping, and fingering. (R. 712). He also noted her anxiety. (R. 717). At the conclusion of the examination, Dr. Williamson's impressions included median neuropathy at the wrists and psychiatric disorders. (R. 718). He limited Plaintiff's work activities to lifting no more than 20 pounds; occasionally stooping; no crouching; standing, sitting, and walking up to 6 hours in an 8-hour workday; and grasping, holding, and turning objects with accommodations for prolonged performance using her upper extremities. (R. 718). Dr. Williamson's examination does not mention any headache disorder or related symptoms or limitations. *See* (Ex. 4F).

*Function Reports, Questionnaires, and Hearing Testimony*

In 2019, Plaintiff completed questionnaires and function reports as part of her application. (Exs. 7E, 8E, 9E, 15E). Plaintiff explained that she has headaches every day and migraines two to four times per week. (R. 522, 535). The migraines keep her from working because she has to stay in bed until they are over. (R. 522, 526), and some attacks last one to three days. (R. 535, 576). Stress, excessive bright lights, lack of sleep, weather, heat, physical exertion, and some of her medications make her headaches worse. (R. 535). If her headache medications are unable to control her migraines, she goes to Dr. Al Husein or the ER for an injection. (*Id*.) She explained that she normally has to stay in bed 30 minutes to an hour before

she gets up, but pain usually causes her to return to bed by late afternoon. (R. 527). At times, she is unable to get out of bed. (R. 576). She can no longer crochet, garden, cook, take care of her children, and work because of her conditions, and her ability to take of herself has changed. (R. 527-528, 530, 577, 580). She does laundry and light cleaning, but it may take her all day to complete these chores, assuming she is able to complete them. (R. 528, 578). She is able to drive and ride in a car. (R. 529). In her first function report, Plaintiff stated she buys a few groceries in a store, but the remainder of her shopping happens online. (*Id.*) In her second report, all shopping was described as online, and she stated that she rarely goes outside except for appointments. (R. 579-580). She reported having issues with her family members and sometimes has problems with authority figures. (R. 531, 532, 581, 582). Plaintiff attributed limitations in every listed activity on the function report, except talking and hearing, to her impairments. (R. 531). In her second report, she also excluded her ability to reach. (R. 581). She explained she was able to walk the length of her house or to the mailbox, stand for 10 minutes before resting, and sit 15 minutes. (R. 523, 531, 581). She would need to rest about 45 minutes to an hour before resuming walking. (R. 581).

Plaintiff's husband also completed a function report. (Ex. 14E). He described Plaintiff as being in bed most of the time, and her migraines last three to four days each time. (R. 568) He believes that she will not be able to work because she will miss too many days. (*Id.*, R. 575). He stated that Plaintiff tries to complete chores but usually ends up back in bed on a bad day, and that he will finish the chores that Plaintiff starts. (R. 569, 571). He explained that he has to remind Plaintiff to tend to personal care, such as bathing. (R. 569-570). He stated that Plaintiff can go out and drive alone, but she rarely does, and he prefers to go with her because of her impairments. (R. 571, 572). All activities were marked as being limited by Plaintiff's

11

impairments, except for talking and seeing. (R. 573). Plaintiff's husband limited Plaintiff to walking the distance to their mailbox before having to rest. (*Id.*) He also stated that Plaintiff could only pay attention for a few minutes and that she rarely finishes activities that she starts. (*Id.*)

At the hearing before the ALJ, Plaintiff testified that she was experiencing a migraine that had lasted four days, and normally her migraines require bedrest in a dark room. (R. 45-46). Plaintiff described traveling to Texas and Michigan for treatment because her migraines were progressively getting worse, and she was unable to be seen at Emory. (R. 44). She explained treatment for intracranial pressure, including her current medication. (R. 45). Plaintiff explained her treatment with Dr. Parihar and her understanding that her migraines would only continue to be worse. (R. 50). Plaintiff gave a history of migraines, which began in her teens. (R. 46). The frequency and intensity of the migraines changed in 2014, which led to memory issues and absenteeism at past work. (R. 47-49). Plaintiff explained the limitations her conditions placed on being able perform household chores and other functioning areas, which also increased the responsibilities of her husband. (R. 51-52, 57).

**DISABILITY EVALUATION IN PLAINTIFF'S CASE**

Following the five-step sequential evaluation procedure, the reviewing ALJ made several findings in Plaintiff's case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2014, through her date last insured, March 31, 2019. (R. 18). At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine with radiculopathy; degenerative joint disease of the right shoulder; carpal tunnel syndrome; obesity; migraine headaches; major depressive disorder, and anxiety. (*Id.*) He also deemed the following ailments as non-severe: acid reflux

status post Nissen fundoplication, gastritis, ovarian cyst status post left salpingo-oophorectomy, and being post hysterectomy. (R. 19).

At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19-21). Therefore, the ALJ assessed Plaintiff's RFC, and found that Plaintiff could perform light work with the following exceptions:

> With both upper extremities, the claimant could frequently use hand controls, handle, finger, feel and reach in all directions, including overhead. The claimant could occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. The claimant could frequently balance. She could occasionally stoop kneel and crouch. She could never crawl. The claimant could have occasional exposure to unprotected heights, moving mechanical parts and variation. The claimant was able to perform simple, routine and repetitive tasks involving up to detailed, but uninvolved instructions (reasoning level 2). She could make simple work-related decisions. She could have frequent interaction with supervisors and coworkers, but occasional interaction with the public. She could work with occasional changes in the work setting.
>
> (R. 21).

After determining Plaintiff's RFC, the ALJ found that Plaintiff was unable to perform past relevant work as a paralegal, correction officer, and receptionist. (R. 25). At step five, the ALJ determined that there are jobs existing which Plaintiff can perform, including production assembler, electrical assembler, and accessories routing clerk. (R. 26). As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act at any time from January 1, 2014, through March 31, 2019. (R. 27).

## ANALYSIS

Plaintiff's sole enumeration of error contends that the ALJ's decision is not supported by substantial evidence because of the ALJ's inadequate consideration of Plaintiff's migraines. (Doc. 15, p. 1, 8). Plaintiff specifically alleges that the ALJ failed to consider the frequency, intensity, and duration of Plaintiff's migraines and the rate of absenteeism and time off-task they would create in the RFC. (*Id.*, p. 9-12). The ALJ adequately considered these areas throughout his decision, including in the resulting RFC. The ALJ appropriately articulated his consideration of the relevant medical record, including Plaintiff's migraine headaches, when determining Plaintiff's RFC and applied the correct legal standards and regulations. The decision is supported by substantial evidence. There is no basis to remand Plaintiff's case.

1. <u>The ALJ appropriately considered the severity of Plaintiff's migraines within the relevant period.</u>

For applications filed on or after March 27, 2017, there is no longer a requirement to give treating physicians deference. *See* 20 C.F.R. § 404.1520c. Plaintiff filed her application for benefits in January 2019. The weight given to all medical opinion evidence – even those opinions from Plaintiff's own treating physicians – is now governed by 20 C.F.R. § 404.1520c.

Under these regulations, the agency no longer defers or gives any specific evidentiary weight to any medical opinion, even those from a claimant's own medical sources. 20 C.F.R. § 404.1520c(a). The decision instead must articulate how persuasive the medical opinions and prior administrative findings were found to be. 20 C.F.R. § 404.1520c(b). The decision is not required to articulate the determination for each and every record, however, and instead may discuss the source of the opinion in a single analysis. 20 C.F.R. §§ 404.1520c(b)(1). The following factors will be used to consider and weigh the record: supportability, consistency, relationship with the claimant, and specialization. 20 C.F.R. §§ 404.150c(c)(1)-(4). The most

important factors are supportability and consistency, and the decision must state how these factors were considered in the disability determination. 20 C.F.R § 404.1520c(b)(2).

The ALJ correctly identified and applied the applicable legal standards, and the decision adequately explains the findings and conclusions. After the ALJ found that Plaintiff had medically determinable impairments which could reasonably be expected to cause her alleged symptoms (R. 22), he next had to evaluate the intensity and persistence of Plaintiff's symptoms and their effect on her ability to work, by considering the objective medical evidence, the claimant's daily activities, treatment and medications received, and other factors concerning functional limitations and restrictions due to pain. *See* 20 C.F.R. § 404.1529. The ALJ found that Plaintiff's descriptions "concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (R. 22). The regulations found in 20 C.F.R. § 404.1520c, outlined above, govern the consideration of medical opinions in context of this evaluation as there is no longer a treating physician rule or deference. Additionally, "[i]f the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).

The ALJ's findings and conclusions must be adequately supported such that the Court may review his decision. Although the post-March 27, 2017 regulations apply, the regulations do not change that the ALJ must explain the factors considered with particularity. Otherwise, "'…it [would be] impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.' [When] the ALJ fails 'to state with at least some measure of clarity the grounds for his decision,' [the Court] will decline

to affirm 'simply because some rational might have supported the ALJ's conclusion.'" *Winschel*, 631 F.2d at 1179 (citations omitted).

Plaintiff cited several district court cases to argue that consideration of the frequency, intensity, and duration of Plaintiff's migraines is mandatory and that the ALJ's failure to do so makes it impossible to determine whether the RFC is supported by substantial evidence, which requires reversal and remand. (*Id*. at 9-10). Although there appears to be no Eleventh Circuit decision requiring such an evaluation in claims involving headaches, the ALJ's decision does address the frequency, intensity, and duration of Plaintiff's migraines in the context of the entire record *for the relevant period*.

The ALJ found that Plaintiff's migraines counted as a severe condition. (R. 18-20). He acknowledged the records for Plaintiff's migraine treatment, including the frequency of her migraine attacks and the need to have injections to treat her migraines. (R. 23-24). He noted that Plaintiff's migraines are associated with "photophonophobia and nausea." (R. 24). He reviewed the record that noted that Plaintiff rarely needed emergency treatment to control her migraines. (*Id*). The ALJ also referenced Plaintiff's ongoing fatigue, sleepiness, and snoring. (*Id*.) The records the ALJ specifically cited span from July 2015 to December 2018. (R. 24, 638, 1316). While the ALJ did not specifically reference the early 2019 records from Dr. Al Husein, Plaintiff did not report migraines at those appointments. (R. 1311, 1308, 1305).

In his decision, the ALJ noted Plaintiff's testimony about her daily headaches, migraine frequency, the worsening of her migraines, changes in medications, and need to go to bed for up to three days. (R. 22). The ALJ acknowledged the limitations discussed in Plaintiff's husband's function report. (R. 25). He ultimately found that the reported subjective symptoms were not consistent with the objective medical record. As detailed above, the treatment records indicate

that Plaintiff typically reported to Dr. Al Husein that she experienced migraines on a more or less monthly basis and that she experienced improvement with medication. On many visits, it appears that migraines were not even discussed. During a period between May and July of 2019, Plaintiff did report more frequent migraines, stating on May 14, 2019, that she had been experiencing headaches "almost daily" (R. 1299), on June 13, 2019, that her migraines had improved but she was still experiencing "a major attack at least once weekly" (R. 1294), and on July 25, 2019, that she was "still having frequent attacks of migraine." (R. 1288). Nothing in the medical records, however, supports Plaintiff's testimony that she experienced migraines 2 to 4 times per week, each requiring her to remain in bed from 1 to 3 days.

      The decision is well articulated and shows the ALJ considered the record as a whole. The ALJ found that Plaintiff's report and experience with her migraines, and even regular headaches, ebbed and flowed throughout the record as compared to the subjective symptoms she described at the hearing. There is no error with the manner in which the ALJ considered the severity of Plaintiff's migraines during the relevant period.

      The disability period of this case is limited by Plaintiff's onset date and DLI. Plaintiff's DLI is March 31, 2019. Plaintiff acknowledges that much of the treatment for her worsening migraines, including her out-of-state treatment, occurred *after* the DLI. (Doc. 15, p. 4-5). Despite acknowledging the post-DLI timeframe of the treatment, Plaintiff has argued to the ALJ, the Appeals Council, and now this Court, that these records should be considered to establish disability during the relevant period. (*Id*.; Ex. 28E; R. 38-39, 62-63). The ALJ had the benefit of these records[1] and argument, but correctly based the decision based on consideration of the record during the relevant period. Plaintiff's attempts to establish the ALJ's failure to recognize

---

[1] Although the ALJ did not have the records submitted to the Appeals Council, the ALJ was aware of this treatment because many of the post-DLI treatment in the ALJ's record reference Plaintiff's emergency room treatment.

17

the severity of Plaintiff's migraines based upon post-DLI treatment records are misplaced. The ALJ properly reviewed and considered the objective medical evidence compared to Plaintiff's symptoms based upon the record before him during the relevant period.

   2. <u>The RFC reflects limitations supported by the record and is supported by substantial evidence.</u>

Plaintiff argues that if the ALJ had appropriately considered the severity of Plaintiff's migraines and the rate of absenteeism and time off-task the migraines would cause, the ALJ would have found Plaintiff disabled, and, therefore, any RFC cannot be supported by substantial evidence. (Doc. 15, p. 11-12). The ALJ appropriately accounted for limitations which were supported by the record during the relevant period. Therefore, the RFC is supported by substantial evidence.

After posing the initial hypothetical to the vocational expert (VE), the ALJ questioned the VE regarding the maximum absenteeism and time-off task that would be allowed. (R. 60-61). The VE opined that more than "more than 10% off task" would preclude employment. (R. 61). He then stated that regularly missing more than two days of work per month would also preclude employment. (*Id.*) Plaintiff argues that her condition exceeds these limitations and that she would have been deemed disabled if the ALJ had appropriately considered her condition. Plaintiff again relies on the records following the relevant period to prove she would exceed the permitted absenteeism and off task rates.

As discussed above, the ALJ appropriately considered Plaintiff's migraines and their effects along with Plaintiff's subjective symptoms based on the record for the relevant period. From the ALJ's questioning of the VE, he considered that absenteeism and time off task may be at issue but ultimately, upon examining the record, did not include it in the RFC. The ALJ has the responsibility to assess the RFC. 20 C.FR. § 404.1546(c). In doing so, an ALJ is not required

to include limitations in the RFC which he rejects as not supported by the record. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004). Here, the ALJ broke down the limitations of the RFC and explained how or why each limitation was included. (R. 22-25). His reasoning is clearly articulated with citations to the relevant record. Ultimately, Plaintiff is asking the Court to reweigh the evidence, which this court cannot do. *Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1314 (11th Cir. 2021) (citing *Winschel*, 631 F.3d at 1178). The limitations included the RFC are supported by substantial evidence.

## CONCLUSION

Based on the foregoing reasons, there is no error in the ALJ's consideration of Plaintiff's migraines or the decision to not include further limitations in the RFC, and the findings are supported by substantial evidence. The Commissioner's decision is therefore **AFFIRMED**.

**SO ORDERED** this 28th day of September, 2022.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge